IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 MAY 28 AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SURE GRIP OF NORTH AMERICA, LLC, et al., | ) ) ) |
| Plaintiffs and counterclaim defendants, | ) ) ) ) |
| v. | ) ) |
| ULTRALINER, INC., et al., | ) ) |
| Defendants and counterclaimants. | ) |

ENTERED
MAY 28 2003

Civil Action No.:
CV-99-AR-2039-S

**MEMORANDUM OPINION**

Before the court are objections by plaintiff and counterclaim defendants, Sure Grip North America ("SGNA"), Stephen Catha ("Catha") and Bronson Doyle ("Doyle"), to the Magistrate Judge's report and recommendation that the defendants' motion for summary judgment be granted as to all of SGNA's claims, and that counterclaim defendants' motion for summary judgment be granted as to all but one of the counterclaims brought by Ultraliner and Luke Whittle ("Whittle"). SGNA filed this action in August of 1999, alleging breach of contract, fraudulent suppression, fraudulent misrepresentation and promissory fraud. Ultraliner and Whittle filed a counterclaim alleging misrepresentation and fraudulent suppression.

**Statement of Undisputed Facts**

On May 1, 1996, AGRU Alois Gruber Gmbh ("AGRU"), an Austrian company that



manufactures a patented "trenchless" pipelining product, and Catha, one of the principal owners of SGNA, executed an agreement which gave Catha the exclusive right to distribute AGRU's patented liner sheet in North America for applications relating to the renovation and rehabilitation of continuous pipes, conduits and tunnel. To maintain the exclusivity, SGNA was obligated to sell 30,000 square meters of pipeliner by May of 1999. After entering into the exclusive licensing agreement, SGNA was unsuccessful in its efforts to obtain adequate capitalization for its bids to become a national installer of the AGRU product, resulting in difficulties in meeting the performance requirement.

In early 1998, SGNA had worked out a deal for the sale of its assets to Dresser Industries ("Dresser"), and the two companies signed a formal letter of intent. Dresser, however, merged with Haliburton Corporation which resulted in the deal falling apart. By June 1998, a dispute had begun to develop between AGRU and SGNA regarding the exclusivity license. In June of 1998, SGNA informed Dresser that it believed that AGRU was in breach of the license agreement. This belief was based on the fact that AGRU had brought a representative of Trolining, a competitor of SGNA, to a meeting between SGNA and Dresser regarding Dresser's potential purchase of SGNA's exclusive North American license with AGRU.

Thereafter, around July 1998, Catha and Whittle, President and principal shareholder of Ultraliner, began discussions regarding a potential business arrangement between Ultraliner and SGNA. Ultraliner is an Alabama corporation. Its primary business is the sale and distribution of trenchless pipeline rehabilitation products. SGNA's two principal owners, Catha and Doyle, participated in the negotiations on behalf of SGNA. SGNA proposed a "standstill" agreement under which it would, in exchange for money, stop negotiations with parties other than

2

Ultraliner, but Ultraliner declined to enter such an agreement. During the course of discussions, SGNA provided Ultraliner and its lawyers with information and documents regarding SGNA and the AGRU product. For instance, SGNA provided Ultraliner with a copy of the AGRU license, documents that provided information about the AGRU product, documents that provided information about AGRU, and documents that provided information about Trolining. SGNA also disclosed to Ultraliner that the exclusivity provision of the AGRU license was subject to termination if the minimum performance standards were not met by May of 1999.

On January 6, 1999, Ultraliner prepared a letter of intent in which Whittle proposed certain parameters for the negotiations for sale of the license. The letter stated that "[t]his letter of intent does not contain all matters on which the agreement must be reached in order for the sales transaction to be consummated as it is intended solely as an outline of certain material terms." SGNA did not execute this letter. On January 7, 1999, SGNA redrafted, executed, and sent a letter, under which it would sell its assets, including its rights to the AGRU license, to Ultraliner for a purchase price of $600,000. SGNA maintains that as discussions progressed the parties agreed to a purchase price of $550,000. SGNA redrafted, executed, and sent another letter to Ultraliner dated January 22, 1999, reflecting the parties' agreement to sell the rights to the AGRU license for a purchase price of $550,000. These proposed letters of intent had a "time of the essence" clause stating that, if the parties did not sign on or before January 30, 1999, the letter agreement would terminate. Ultraliner never signed either of SGNA's proposed letters of intent. As a result, Catha testified he did not trust Whittle and Ultraliner. Catha said that SGNA did not intend to go forward until they had a signed agreement. The plaintiffs state that these were actually intended to be binding letter agreements, rather than non-binding letters of intent.

Although Ultraliner never signed the January 22, 1999, letter, SGNA claims that on numerous occasions Ultraliner informed it that Ultraliner and SGNA had an agreement. On February 1, 1999, Whittle wrote to Catha stating, "[b]y the close of business today, or not later than tomorrow, we should have an agreement in principal on the Sure Grip deal in your and Bronson [Doyle]'s hands." Doyle testified that Ultraliner and SGNA had formed an agreement as to price, method of payment and what Ultraliner was acquiring and whatever rights were under the patent application. Ultraliner maintains that the negotiation process was impeded by a dispute between the parties. Ultraliner wanted to meet with AGRU before finalizing an agreement with SGNA, but SGNA wanted to have a signed agreement before scheduling a meeting between Ultraliner and AGRU. This meeting was important to Ultraliner because before entering into an agreement with SGNA, Ultraliner wanted to be sure that AGRU would provide the technical and manufacturing support necessary to ensure Ultraliner's ability to successfully distribute and install the product. On February 3, 1999, Doyle wrote a note to Whittle on a copy of Whittle's February 1,1999, letter stating, "Luke, we're concerned. Give us a call," and faxed it back to Whittle. Catha testified that after this note was faxed and for about 30 days thereafter, Whittle assured him repeatedly that the letter was signed and had been sent to Ultraliner's lawyers although SGNA never received such a letter.

Despite this dispute, SGNA proceeded to draft an announcement of the agreement to send to AGRU. The announcement was discussed with Whittle and sent to AGRU on or about February 16, 1999. Doyle confirmed this in writing to Whittle stating, "[r]elying on your confirmation that our deal is 'done' we have forwarded to AGRU the enclosed modification of the fax we discussed earlier." On February 19, 1999, Doyle sent an announcement to Ultraliner's

attorney stating "[w]e have been repeatedly assured by Luke that we had a 'done deal', and based on that and Luke's request that we do so, we forwarded the enclosed fax to our licensor AGRU. I am concerned about the timing and nature of any such comments and the possibility that your review could involve suggested changes in the terms of the deal or delays in proceeding to a closing." Neither Whittle nor Ultraliner's attorney responded to this letter.

In response to the February 16, 1999, announcement, AGRU wrote to SGNA stating, "[r]egarding our agreement we would like to state that we still respect our agreement completely, but we think that you should already point out to your customer now that we will terminate the exclusivity if the minimum order quantities won't be obtained." Thus, AGRU confirmed that SGNA still held an exclusive license which could be maintained by obtaining the minimum order quantities pursuant to the AGRU license. SGNA faxed this letter to Whittle with the following handwritten notes:

(1) This should satisfy our AGRU closing condition,

(2) As you know, the patent continuation-in-part application must be made by March 9 and will require a good deal of work prior to the filings. Please forward the $10,000 referenced in our agreement for patent matters,

(3) We need to discuss strategic planning well before the AGRU meeting and should set up a schedule for closing on our transaction as soon as possible.

Ultraliner never sent SGNA the requested $10,000.

In preparation for the March 8, 1999, meeting with AGRU, SGNA, and Ultraliner, AGRU requested that it be provided with an agenda. Whittle listed on the agenda the following

5

items: transfer of agreement procedure, patent assistance for protections-indemnification, market strategy–expected support, product performance characteristics- 1) pipe, 2) size, 3) configuration, research information and support, and open discussion. On March 2, 1999, Whittle communicated to Doyle that he believed Ultraliner would be obligated to go forward with the deal only if Whittle was satisfied with AGRU's cooperation as a supplier and that Whittle did not intend to sign off on documentation of the deal prior to the meeting with AGRU. Doyle responded in a letter stating as follows:

> I was concerned about our telephone conversation yesterday. During the past few months we have repeatedly discussed the importance of timing in light of the May 1 performance standard required to maintain the exclusivity of the AGRU license. Although you obviously did not agree to the January cut-off date we had proposed, we did agree on the structure, price and method of payment for the acquisition of SGNA's assets, conditioned on AGRU's consent to the transfer of the AGRU license.
>
> In anticipation of receiving a signed letter agreement reflecting the terms of the agreement we agreed to meet with AGRU in South Carolina on March 8. On February 15, relying on your confirmation that we had a "done deal," we forwarded a fax (that you had received and approved) announcing our agreement to AGRU and requesting an earlier meeting in Austria and a confirmation that the AGRU agreement was in full force and effect and assignable. Mag. Alois Gruber responded by fax, a copy of which was provided to you, indicating that he could not meet prior to the March date but that we could discuss our deal at the meeting and confirming that AGRU would "respect our agreement completely."
>
> You have now informed me that, although you acknowledge that we did reach an agreement as to the terms of the deal, you believe that you will be obligated to go forward with the deal only if you are satisfied with AGRU's cooperation as a supplier and you do not intend to sign off on documentation of the deal prior to the meeting with AGRU. You have indicated that the cooperation that you refer to will not require modification of the terms of the AGRU agreement and relates to technical support regarding the Sure Grip® liner and reasonable technical assistance in introducing the product to the North American market. In this narrow context, and reserving any and all of our rights regarding our appreciation of our agreement, we are prepared to go forward with the meeting in South Carolina next Monday.

Whittle responded by writing directly on Doyle's letter and returning it by fax to him. He stated that, rather than the deal being "conditioned on AGRU's consent to the transfer of the AGRU license," Ultraliner actually "had many other items which required a meeting with AGRU." Ultraliner's response to the comments about the importance of timing was "we have requested on numerous occasions a meeting with AGRU. Until recently you have not honored that request. These requests started last winter." With respect to AGRU, Whittle noted that "[w]e don't know this firm, its supportability, the cost of materials, installation procedures, etc., which we discussed." Whittle further stated that he never indicated that "cooperation you refer to will not require modification of the terms of the AGRU agreement." Instead, he countered, "I stated to you 'brutally frank,' it appears these people are not pleased with your performance after 3 years and they would prefer to associate with another firm, Trolining, which they are currently selling product worldwide." With respect to SGNA's stated reservation of rights, Whittle responded as follows: "Don't know what this means, but if we aren't satisfied with responses, our letter of intent stands."

SGNA contends that any conditions which Whittle may have attempted to assert after entering into an agreement were either agreed to by AGRU at the March 8, 1999, meeting or, by virtue of his conduct after the meeting indicated that the conditions were insignificant to him. During the meeting, Whittle himself proposed trading the exclusivity provided under the AGRU license for a nonexclusive arrangement involving Trolining. At no point did Whittle express any concerns regarding the exclusivity of the license, which he was apparently willing to trade, or any of his other purported conditions. Whittle claims at the March 8, 1999, meeting that he first learned that, despite SGNA's representations that the exclusivity associated with the license

7

could be maintained by Ultraliner's purchase of the minimum quantities under the license agreement, AGRU had no intention of granting Ultraliner or anyone exclusivity, and that it actually intended to license its product to Trolining. Whittle also claims, at this meeting, he first discovered that SGNA had no exclusivity in Canada, that exclusivity in Mexico was questionable, that AGRU would not manufacture the tube pipe, that the sheets would be manufactured in Austria rather than in AGRU's South Carolina plant and that AGRU would provide no field support. Doyle claims that after the meeting Whittle said Ultraliner would honor the deal and that "we're going to put a close on a deal."

On March 23, 1999, Catha faxed Whittle a letter about the shared exclusivity with Trolining. The letter also expressed SGNA's concerns over Ultraliner's apparent communications with Trolining without SGNA's involvement and prior to executing the closing documents of the agreement between Ultraliner and SGNA. On Tuesday March 30, 1999, Whittle informed Catha that he was instructing his lawyer to prepare closing documents and that they could speak on April 1, 1999 to set a date for closing. On April 2, 1999 Catha wrote to Whittle stating that he had attempted to call him several times on the previous day but had not heard back from Whittle. Catha indicated in the letter that AGRU was asking about the status of their deal and that SGNA was concerned that any more delays will put at risk SGNA's ability to maintain its options under the AGRU agreement. Whittle claims he did not make that statement to Catha. On April 9, 1999, Doyle wrote again to Whittle inquiring as to why SGNA had not received the closing documents or a closing date. Catha claims that the very next day Whittle called him and assured him that he would press for completion of the closing documents and proceed to a closing. Whittle claims he told Catha that Ultraliner was not interested in

8

purchasing SGNA and its assets. On April 21, 1999, Doyle faxed Whittle a message again expressing concern over the delays in closing and Whittle's failure to communicate with SGNA. SGNA claims it was not until after this last letter was sent, "on the eve of the expiration of Sure Grip's exclusivity," did Whittle inform SGNA that Ultraliner was not going forward with the agreement.

Ultraliner claims that it learned other facts relevant to its counterclaim during discovery: that SGNA never revealed to Ultraliner that there had been contentious exchanges between SGNA and AGRU regarding the exclusivity provision of the license, that SGNA had been so convinced that AGRU had breached the license agreement that it states as much in a letter to Dresser in June 1998, and that on both September 17, 1997 and March 17, 1999, AGRU notified SGNA that it was terminating SGNA's exclusivity because of its failure to meet minimum purchase requirements.

## Analysis

SGNA argues that the recommendation is due to be rejected as to SGNA's claims because the recommendation fails to follow the appropriate standard for motions for summary judgment–that the court view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in the non-movant's favor. *Dent v. Federal Mogul Corp.,* 129 F.Supp. 2d 1311, 1313 (N.D. Ala. 2001). SGNA claims that the recommendation goes so far as to quote almost verbatim Ultraliner's rendition of the facts. Ultraliner correctly contends that there are at least three reasons why SGNA's arguments on this issue are flawed. First, the mere fact that the Magistrate Judge ultimately agreed with Ultraliner's legal arguments does not mean that he failed to consider the evidence in a light most favorable to SGNA. A court is not

required to disregard evidence which affirmatively demonstrates the absence of any genuine issue of material fact. Furthermore, a comparison of the facts set forth in the parties' briefs and the facts summarized in the Magistrate Judge's report demonstrates that any relevant facts argued by either party were made a party of the court's analysis. This is not a case where the facts are greatly disputed. The true issue is whether the facts demonstrate that SGNA can state a cause of action for breach of contract or fraud against Ultraliner. Finally, SGNA did not take issue with Ultraliner's version of the facts until it filed its objections to the Magistrate Judge's recommendation. While SGNA's responsive brief had a narrative summary which omits certain facts asserted by Ultraliner and adds certain other facts, nowhere in its responsive brief does SGNA assert that any single fact alleged by Ultraliner is erroneous and/or disputed.

In his recommendation, the Magistrate Judge correctly determined that Ultraliner was entitled to summary judgment with respect to SGNA's breach of contract claim for two reasons: (1) because there was no manifestation of mutual assent to the essential terms of the contract, and (2) even if a contract can said to have been made, there was a failure of conditions precedent.

SGNA argues that the Magistrate Judge's analysis of mutual assent was flawed because the analysis was premised on Ultraliner's erroneous assertion that SGNA's breach of contract is based on an unspecified oral agreement reached after Ultraliner rejected a January 22, 1999, proposed letter of intent. SGNA argues that it offered sufficient evidence from which a reasonable inference could be made that the negotiated issues reflected in the changes from the proposed January 6, 1999, letter of intent to the proposed January 7, 1999, letter agreement, and then to the January 22, 1999, letter agreement, reflected progress in the negotiation process

which ultimately culminated in a binding agreement and which was confirmed in writing on February 16, 1999.

It is undisputed that there was no written contract between the parties. The primary issue in this case has been whether an oral contract existed. The record shows that all of the proposed letters of intent, including those drafted by SGNA, contained express language characterizing the parties agreement as tentative and non-binding. The evidence also shows that the parties were never able to reach an agreement as to language important to one or both of the parties. The February 16, 1999, communication which allegedly confirmed the existence of a binding agreement is a two-sentence fax from Doyle to Whittle which says: "Relying on your confirmation that our deal is 'done,' we have forwarded to AGRU the enclosed modification of the fax we discussed earlier. Please send us an executed copy of our letter agreement at your earliest convenience." There was never a letter agreement executed. Further, even assuming that the letter agreement was executed, it expressly provided the agreement was tentative and conditional. A letter of intent or a similar preliminary writing that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties

SGNA argues that when viewed in the light most favorable to SGNA, reasonable inferences can be made that SGNA was not questioning whether a binding agreement existed, but instead whether Ultraliner and Whittle were going to honor the agreement that already existed. Ultraliner correctly points out that whether the evidence shows that SGNA was questioning the existence of a contract versus whether it shows that SGNA was questioning Ultraliner's intent to honor the contract is irrelevant to the analysis of mutual assent. The crucial

question in the mutual assent analysis is: did Ultraliner's external and objective actions manifest Ultraliner's assent to the essential terms of the contract? Although the question of whether particular conduct is sufficient to support a finding that an implied contract exists is generally submitted to a trier of fact, the question may be resolved by summary judgment if reasonable minds could not differ. Ultraliner's actions, even when viewed in a light most favorable to SGNA, cannot be said to manifest Ultraliner's mutual assent to the terms of the contract.

The Magistrate Judge also found that, even assuming there was a binding oral contract between the parties, there were also conditions precedent which were not satisfied. SGNA claims that the only condition precedent was AGRU's consent to SGNA's transfer of the AGRU license, and that condition was satisfied. However, in its brief in opposition to Ultraliner's motion for summary judgment, SGNA recognized the existence of other conditions precedent, but argued that all of the conditions precedent had been satisfied. The January 22, 1999, letter of intent drafted by SGNA and alleged by SGNA to be the embodiment of the parties' contract expressly recognizes the existence of other conditions precedent. For instance, the letter of intent requires the approval of the agreement of sale by the Board of Directors of Ultraliner and the members of the SGNA. SGNA contends that Whittle's representation that closing documents are being prepared is sufficient evidence to support a reasonable inference that any condition precedent had been satisfied and that the parties had manifested an assent to the terms of an agreement. However, this court agrees with the report and recommendation that any alleged move to prepare closing documents does not show that there was mutual assent that the conditions precedent had been fulfilled since it was evident that Whittle was still conducting due diligence inquiries at the time and since Whittle's actions–continuing questions and delays and

12

failing to return phone calls about working on a closing–indicated that Ultraliner was not satisfied that all conditions precedent had been fulfilled.

In regards to the misrepresentation claim, SGNA contends that for purposes of summary judgment, it came forward with sufficient evidence demonstrating that defendants made a false statement of material fact, namely, that SGNA and Ultraliner had an agreement. Thus, SGNA asserts that there was a binding contract between the parties and Ultraliner breached it and then it argues that Ultraliner fraudulently represented the existence of a contract. If a contract existed, Ultraliner's representations that a contract existed could not have been false. The Magistrate Judge was correct in agreeing with Ultraliner's argument that "since the existence of a contract is itself dependant upon the mutual assent of the parties as to the essential terms of the contract . . . there could not be a misrepresentation as to the existence of a contract between Ultraliner and SGNA."

SGNA also argues that the recommendation impermissibly weighs the evidence in concluding that SGNA did not reasonably rely on the defendants' representations. However, the evidence was that SGNA was not confident in Ultraliner's willingness to proceed even after the March 8, 1999, meeting. SGNA had reason to doubt the existence of an agreement. To rely on any alleged misrepresentation regarding the existence of an agreement would not have been reasonable as a matter of law.

SGNA contends that the evidence is also sufficient to support SGNA's alternative promissory fraud theory. The Magistrate Judge found that Whittle's alleged statement that the parties had a "done deal" was not a promise to act in the future. Furthermore, even if it were, SGNA did not make the requisite showing that Whittle had an intent to deceive at the time the

alleged promise was made. After this statement was made, Ultraliner and Whittle made significant effort to meet with AGRU and SGNA and to investigate the product and the business opportunity. Whittle testified that it had taken some time after getting the new information at the March 8, 1999, meeting to consider the deal and make a decision on it. SGNA did not reasonably rely on these claims at a time when it appears that Whittle was still hesitating, asking questions and conducting due diligence. As the defendants correctly point out, even assuming *arguendo* that SGNA could maintain its argument that the existence of a contract was somehow misrepresented and its reliance on those representations was reasonable, SGNA would still have the burden of producing evidence in support of damages. As noted in the report and recommendation regarding SGNA's promissory fraud claim:

> . . .[E]ven if there was reasonable reliance, there is no indication that SGNA suffered any substantive damages as a result of such an alleged misrepresentation. Such a representation was made only shortly before the exclusivity of the license expired, and SGNA no longer relied upon it as of the end of April, 1999. There were no other suitors in the wings ready to step into Ultraliner's shoes, and it is virtually impossible that, after years of a search unsuccessfully for such a suitor, one could have been found before the exclusivity period expired.

As the report and recommendation stated, SGNA's "fraudulent suppression claim is, for all practical purposes, a restatement of the other fraud claims addressed above." The Magistrate Judge found that the claim fails because SGNA did not make the requisite showing that the defendants did not intend to go through with the purchase of SGNA's assets, and that SGNA did not show a genuine issue of material fact with respect to such an intent. This court agrees with the report and recommendation's conclusion that the defendants' motion for summary judgment was due to be granted with respect to the fraudulent suppression claim.

With respect to Ultraliner's counterclaim against SGNA, the Magistrate Judge determined that SGNA was entitled to summary judgment as to Ultraliner's claim for fraudulent suppression. He also determined, however, that there are genuine issues of material fact precluding summary judgment on Ultraliner's misrepresentation claim only insofar as the claim was based on misrepresentations relating to "the exclusivity aspects of the license" and "the status of SGNA's relationship with AGRU related to that exclusivity." SGNA's first criticism of the report and recommendation in this regard is that since the Magistrate Judge found that SGNA was entitled to summary judgment on Ultraliner's claims for suppression, he should have found that it was entitled to summary judgment on a misrepresentation claim concerning the same subject. However, fraudulent suppression and fraudulent misrepresentation are completely separate and distinct claims. A determination that SGNA had no duty to disclose certain facts does not lead to the conclusion that there can be no cause of action for an affirmative misrepresentation of material facts.

SGNA contends that the recommendation does not point to a single misrepresentation made by it. This is not true. For instance, the Magistrate Judge noted that Whitte, in his affidavit, stated as follows:

> 4. After this lawsuit was filed by [SGNA] against both Ultraliner and me as an individual, [SGNA] produced to my attorneys documents showing that the effect and scope of the exclusivity provision of the license agreement had been disputed between AGRU and [SGNA] for some time, and that AGRU had attempted to terminate the exclusivity prior to [SGNA's] negotiations with Ultraliner.
> 5. No one from [SGNA] ever told me that AGRU had attempted to terminate the exclusivity of the license agreement.
> 6. Other documents produced by [SGNA] in the course of this lawsuit

15

> showed that [SGNA] itself believed that AGRU had breached the license agreement. Again, this is not something that anyone at SGNA ever told me.
>
> 7. If I had been told the truth about the history between [SGNA] and AGRU, Ultraliner would not have continued negotiations with [SGNA]. Instead, Ultraliner expended time and resources in evaluating the AGRU product and the possibility of purchasing [SGNA's] license agreement with AGRU.

The Magistrate Judge further noted that the counterclaim plaintiffs acknowledges that the counterclaim defendants provided them with a copy of the licensing agreement and that

> [w]hile [SGNA's] representation may not have been "inconsistent" with the terms of the written license agreement, they were undoubtedly inconsistent with what [SGNA] knew to be AGRU's position on the exclusivity. The evidence shows that at the time [SGNA] made such representations, it was aware that AGRU did not agree with SGNA's own interpretation of the minimum performance standards required by the license agreement, that AGRU did not intend to continue with an exclusive agreement, and that AGRU intended to license its product to Trolining.

SGNA further argues that the truth concerning the facts alleged to have been misrepresented was eventually made known to Ultraliner, and therefore that Ultraliner could not have relied on those facts. This court agrees with the report and recommendation's conclusion that once Ultraliner learned the truth, it could no longer reasonably rely on the misrepresentations. Ultraliner, however, produced evidence that it relied on those representations to its detriment prior to its discovering the truth. Thus, the Magistrate Judge correctly determined that there are genuine disputes of material fact as to whether Ultraliner was damaged by its reasonable reliance on SGNA's affirmative misrepresentations concerning the exclusivity of the license agreements and SGNA's dispute with AGRU regarding the same.  The limited extent of that damage may not make this claim worth pursuing without any possibility of obtaining punitive damages.

## Conclusion

By separate order, the court will adopt the Magistrate Judge's report and recommendation in its entirety.

DONE this 28th day of May, 2003.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

17